O’NIELL, Chief Justice.
 

 The Weinberger Banana Company chartered the -steamship Gaston • from the owner, the Poydras Fruit Company, for three months, August, September and October, 1936, at $1,500 per month. • It was stipulated in the charter that the charterer should, at its own experise, mAn and fuel and supply and operate -the ship, and keep her in good running order and condition, and substantially in the same condition as when received from the owner, and to have her regularly overhauled and repaired when necessary, provided the cost of any one item of -necessary repair should not exceed $100. It was stipulated that the charterer should return the ship to the owner at the Port of New Orleans at the end of the three months, and that if the ship should be lost the hire should be paid to the date of the loss. The ship was destroyed by fire while lying at anchor about three miles — a marine league — out from the Port of Zamora, Mexico, on the '2d of October, 1936. The charterer promptly notified the owner that the, ship was destroyed by fire. The rent was paid regularly and was paid up to and including the day of the fire.
 

 On the 15th of October, 1936, the attorney for the Poydras Fruit Company made a written request of the Weinberger Banana Company to furnish full particulars regarding the fire that destroyed the ship; and, on the next day, the attorney for the Weinberger Banana Company, in' answer to the letter from the attorney for the Poydras Fruit' Company, sent him a copy of a sworn statement or report made by the ship’s master, Capt. Karl Johansen, describing the circumstances of the fire that had destroyed the ship. I'n his letter the attorney for the Weinberger Banana Company said that he believed that the sworn statement or report made by Capt. Johansen covered practically all of - the particulars regarding the loss of the ship. The sworn statement or report was made on the arrival of the master and the destitute crew .of the ship in New Orleans on October 10, 1936. According to the report, the ship sailed from Galveston, Tex., on the 29th of September, 1936, destined for Zamora, Mexico, where she was to take on a cargo of bananas; but when she arrived near the port of Zamora the weather was so rough and the sea was running so high that the ship could not enter the port. The relevant and important part of the master’s report of the disaster is given in his own words, thus:
 

 “My ship reached the Port of Zamora on Wednesday, September 30, - 1936, at
 
 *945
 
 about eight o’clock a. m., and the weather was qiiite rough; and we were compelled to wait until Thursday, October 1, 1936, before the port officials could come out to clear the ship Gaston. Due to stress of weather, it was not possible for the lighters conveying the cargo to reach the vessel, and, on Friday, October 2, 1936, I decided to weigh anchor and proceed to Tuxpan, Republic of Mexico, and I gave the chief engineer instructions accordingly.
 

 “The chief engineer sent Leroy Brooker, one of the members of the crew, who was fireman of the Gaston, down to the engine room. In some unaccountable manner, not known to me, there-was an explosion, not of the boiler nor any of the machinery, but apparently due to back-fire from the oil burner, — the ship being fueled and fired with fuel bunker oil. Immediately after [afterwards] I discovered [that] the fire was of such headway that it was impossible to save the ship. I ordered the crew to take to the boats, and the ship' became a total or constructive total loss. The ship, after burning some three or four hours, sank, and therefore there was no chance of any salvage, she being a total loss. It was a case of barely escaping with our lives, and there was no opportunity to take off any of the ship’s papers, or any clothing, goods or chattels, except what we had on our backs.
 

 “I am able to say, as master, that I used my best judgment in abandoning the ship.
 

 “In closing this statement, I wish to say that this loss was not due to any fault or negligence of the master, and that I am a competent man of experience; nor was the voyage broken up by any fault of the owners or charterers.”
 

 On the 17th of November, 1936 — that is, a month after the attorney for the Poydras Fruit Company received the copy of Capt. Johansen’s report — the company brought this suit, praying that the Weinberger Banana Company should be condemned to return the ship, according to the terms of the charter, or pay the value of the ship, alleged to be $20,000. The plaintiff did not allege that the ship was destroyed through negligence on the part of the charterer. -In fact, the only reference made to the fire, or to the loss of the ship, in the plaintiff’s petition, was made in a vague - and indirect way, in an allegation to the effect that the defendant
 
 failed or was unable to deliver the
 
 ship, and refused to pay for her.
 

 In answer to the suit the defendant pleaded that it was impossible to return the ship to the plaintiff because of her destruction by fire on October 2, 1936; that the fire was of unknown origin; and that the facts concerning the fire were given to the plaintiff long before the suit was brought. Hence the defendant denied liability for the value of the ship, or for any sum whatsoever; and the defendant denied that the ship was worth $20,000 on August 1, 1936, or at any time thereafter.
 

 After hearing the evidence the judge dismissed the suit. The plaintiff is appealing from the decision.
 

 The main difficulty presented comes from the failure of the plaintiff to allege
 
 *947
 
 that the fire which destroyed the ship was caused by negligence on the part of the charterer. The character of the suit is that of an action for specific enforcement of the obligation of the contract to return the ship, or, in the alternative, for damages, to the extent of the value of the ship, for a breach of the contract in that respect. Considering that the plaintiff was informed before the suit was filed that the ship was destroyed by fire — and had all of the information that was available concerning the origin or cause of the fire — our opinion is that it would have been better practice, or better pleading, for the plaintiff to sue only for damages, to the extent of the value of the ship, and to allege that the ship was destroyed by fire caused by negligence on the part of the defendant. The form in which the action was brought, however, loses much of its importance when we consider that, if the plaintiff had alleged that the ship was destroyed by fire caused by negligence, the plaintiff could not have pointed out, with certainty, precisely or specifically what the negligence consisted of, and would have been obliged to depend upon Captain Johansen’s report of the accident, —and upon the doctrine res ipsa loquitur. The reason why the plaintiff did not allege that the fire was caused by negligence on the part of the defendant is that the attorney for the plaintiff contended— and contends yet — that the burden of proof was on the defendant to show that the fire was not caused by negligence on the part of the defendant or of an officer or a member of the crew. Counsel for the plaintiff contends that this rule of evidence, concerning the burden of proof, is especially applicable to a case where the facts or circumstances surrounding the accident, as far as the facts can be ascer-' tained, indicate that there was negligence on the part of the defendant, or of some employee for whose negligence the defendant would be liable. The contention is founded upon the doctrine that in such cases the accident itself speaks.
 

 The law of Louisiana, according to article 2721 of the Civil Code, having reference to contracts of lease, is that the lessee is not liable for the loss or injury of the leased property unless the loss or injury was caused by his fault. And the law bearing directly upon the point — as stated in article 2723 of the Civil Code — is that a lessee is not liable for the destruction of the leased property by fire unless
 
 it is proved
 
 that the loss was caused by his fault or negligence, or by that of a member of his family. Article 2721 of the Revised Civil Code is an exact copy of the English text of article 2691 of the Code of 1825, which is an accurate translation of the French text, which, in turn, is a literal copy of article 35 of section III of chapter II of. Title VIII of Book III of the Old Civil Code, or Digest, of 1808. In the Fifth Partida, Title VIII, Law 8, Lislet & Carleton’s translation, vol. 2, pp. 726, 727, the law is stated substantially as in the Louisiana codes. But, according to the corresponding article — 1732—of the Code Civil Franjáis, the law of France on the subject oj the burden of proof is directly opposite to the law of Louisiana. There it
 
 *949
 
 is said that the lessee must answer for those wastes or losses which come during his occupancy
 
 unless he can prove
 
 that they have occurred without his fault. This difference, between the law of Louisiana and the law of France, on the subject of the burden of proof, prevails especially in cases where the leased property is destroyed by fire. According to article 2723 of the Revised Civil Code of Louisiana, a lessee is liable for the destruction •of the leased property by fire,
 
 only
 
 “when it is proved that the same has happened ■either by his own fault or neglect, or by that of his family.” That article is an •exact copy of the English text of article 2693 of the Code of 1825, which is an accurate translation of the French text, which, in turn, is a literal copy of article 37 of section III of chapter II of Title VIII of Book III of the Old Civil Code, or Digest, of 1808. But, according to the corresponding article — 1733—of the Code Civil Franjáis, the law of France on the subject of the burden of proof, in cases where the leased property is destroyed by fire, is directly opposite to the law of Louisiana on the subject. In article 1733 of the Code Civil Franjáis, it is said that a lessee is liable in case of a loss by fire
 
 unless he proves
 
 that the fire occurred by accident, or was the result of superior force, or of bad construction, or that the fire was communicated by a neighboring house.
 

 This distinction between the law of Louisiana and the law of France, on the subject of the burden of proof of the cause or origin of a fire that has destroyed or damaged property while it is possessed or occupied by a lessee, was recognized in the case of D’Echaux v. Gibson Cypress Lumber Co., 114 La. 626, 38 So. 476, where a pull boat was leased by D’Echaux to the lumber company, and was partially destroyed by fire while in .the lessee’s possession. D’Echaux contended, in his suit for damages, that the burden of proof was on the defendant to show that there was no negligence. But the court, quoting article 1733 of the Civil Code of France, said (page 477):
 

 “If we had a similar provision in our own Code, the lessee would have to be held down to the same proof. In its absence, we must decline to create a burden the law does not impose.”
 

 A bailee who fails to return the property according to the contract of bailment is liable to the bailor for the value of the property unless the bailee shows that the property was lost or destroyed without fault or negligence on his part. Nicholls v. Roland, 11 Mart, O.S, 190; Ford v. Simmons, 13 La.Ann. 397; Schwartz, Kauffman & Co. v. Baer, 21 La.Ann. 601; Thomas v. Darden, 22 La.Ann. 413. But, when the bailee shows that the property was destroyed by fire, and there is nothing in the showing made by the bailee to indicate that there was fault or negligence on his part, the burden of proof rests upon the bailor to show that there was 'fault or negligence on the part of the bailee. McCullom v. Porter, Thomas & Foley, 17 La.Ann. 89; Gibbons v. Yazoo & M. V. R. Co., 130 La. 671, 58 So. 505; Scott v. Sample, 148 La. 627, 87 So. 478; Austin
 
 *951
 
 v. Heath, 168 La. 605, 122 So. 865; Cau v. Texas & Pacific Ry. Co., 194 U.S. 427, 24 S.Ct. 663, 48 L.Ed. 1053.
 

 This rule, concerning the liability of a bailee for the loss of property in his possession, is applied to charter parties in the admiralty courts. Lake Michigan Car Ferry Transportation Co. v. Crosby, Dist. Ct., Wis., 107 F. 723. But a presumption - of negligence arises against. a bailee for hire — or a charterer in the case of a charter party — “when it appears that the subject of the bailment' [the vessel in case of'a charter party] has been injured or destroyed while within his custody by an accident such as in the ordinary course of things does not happen when a bailee [or charterer] uses due care.” The Genessee, 2 Cir., 138 F. 549, 550. To the same effect, see International Mercantile Marine S. S. Co. v. W. & A. Fletcher Co., 2 Cir., 296 F. 855, where it" was held that a charterer who returned a ship with marks of injury that only negligence would probably cause was obliged to make explanation in order to relieve himself from liability for the injury. The converse of the proposition is stated in Mulvaney v. King Paint Mfg. Co., 2 Cir., 256 F. 612, —thus:
 

 “The presumption of want of care arising from failure to deliver a barge in as good order as it was received by charterer is rebutted, where the injury might have occurred through ordinary wear and tear, and the master testified that there was no fault in her' navigation,
 
 nor any unusual occurrence which would account for the damage.”
 
 (The italics are ours.)
 

 In Hildebrandt v. Flower Lighterage Co., D. C., 277 F. 436, 437, the rule was said to be that the failure of a charterer to return the vessel in good condition, subject to ordinary wear and tear, puts upon him the burden of going forward with evidence-to show that there was no negligence on his part.
 

 The net result of the decisions-rendered in the admiralty cases which we have cited seems to be (1) that no presumption of fault or negligence on the part of a charterer of a vessel arises from the fact itself that she is destroyed by fire while in his charge; (2) that such a presumption may arise, however, if the circumstances surrounding the origin of the fire are such that it would .have been impossible or .highly improbable for the fire to occur without fault or negligence on the part of some one; and (3) that when such, a presumption arises it puts upon the charterer the duty to go forward with evidence to show that there was no fault or negligence on his part. On this subject, the United States Circuit Court of Appeals for the Second Circuit, in the case of Warren & Arthur Smadbeck v. Heling Contracting Corporation, 50 F.2d 99, said (page 101):
 

 “Accidental fires occur without negligence, and the occurrence of the fire does not justify the inference of negligence. In the absence of some explanation as to the origin of the fire and evidence tending to show that it was within the power of the appellant [charterer] to have avoided its occurrence by the exercise of reasonable care, no presumption of negligence is
 
 *953
 
 raised so as to justify the imposition of liability.”
 

 According to the law which we have cited, if there were no indication or suggestion of negligence, in the report made by Capt. Johansen, the charterer would not have been obliged to prove that there was no negligence on the part of any officer or member of the crew of the ship. But, from the master’s report of the accident, and the testimony which he gave as a witness for the defendant, it appears that the explosion which was the beginning of the fire was caused by some act committed by the fireman, Leroy Brooker, in his undertaking to light the oil burner in the fire box of the boiler. The master’s report shows that the explosion occurred immediately after Leroy Brooker went down into the engine room to light the fire in obedience to the order which the master gave, through the chief engineer; and that the explosion was “apparently due to back-fire from the oil burner.”
 

 On the trial of the case, the attorney for the plaintiff proved by the expert testimony of three witnesses, experienced in the handling of oil burners like the one on the Gaston, that such an explosion as Capt. Johansen described could not have occurred without negligence or incompetence on the part of the fireman in attempting to light the oil burner in the firebox, or combustion chamber, of the boiler. One of these expert witnesses was a marine consulting engineer and surveyor, of fifteen years’ experience, and a member of the American Society of Mechanical Engineers, and of the American Society of Naval Engineers. He was well acquainted with the steamship Gaston and her mechanism, having surveyed her many times; and he described in detail that it was impossible for an explosion to result from the lighting of the oil burner if the lighting was done carefully and by a-competent fireman — and that an explosion was very apt to occur if the lighting was done negligently or by an incompetent person. The attorney for the plaintiff' read to the witness the report of Capt. Johansen, and asked the witness if, from the facts stated in the report, he could give an expert opinion as to the cause of the explosion; and the witness expressed the opinion — and 'gave his reasons for the opinion — that the fireman did not allow sufficient time for the oil to be heated to such temperature that it would ignite instantly when sprayed into the combustion chamber, or that the fireman allowed too much oil to enter the combustion chamber before igniting it. Another of the three experts who testified to this effect was a graduate consulting mechanical and .electric engineer, of nearly twenty years’ experience, and of daily experience in the installation of fuel oil burners and pumps. The third of these witnesses was not required to testify, because it was admitted that he was an expert or a specialist on the subject of fuel-oil burners, such as the one that was on the Gaston, and that, if called as a witness, he would testify, as the two other experts had testified. The qualifications of each of the three witnesses were admitted, subject to the objection of the defendant’s' attorney that evidence
 
 *955
 
 tending to prove negligence was not admissible, because the plaintiff did not allege in his petition that there was negligence on the part of the defendant, or of the fireman on the ship.
 

 In connection with the report of Capt. Johansen, as to how the accident happened, the attorney for the plaintiff introduced .the testimony of Capt. Thomas Smith, who was the immediate predecessor of Capt. Johansen as master of the Gaston, and who testified that he knew Leroy Brooker for seven years, as a messman or waiter, and for a while as a cook, but never as a fireman, on a ship. The witness testified that Brooker’s occupation when he was ashore was that of a baker.
 

 The attorney for the defendant promptly and repeatedly objected to the introduction of evidence of negligence or incompetence on the part of Leroy Brooker, on the ground that no such negligence or incompetence was alleged in the plaintiff’s petition. The judge .overruled the objection every time it was urged, and the attorney for the defendant excepted to the rulings. The objection would have been well founded if Capt. Johansen’s report of the origin of the fire had not indicated that the explosion which was the beginning of the fire was caused by negligence or incompetence on the part of the fireman in lighting the oil burner. But our opinion is that the testimony was admissible to explain the coincidence that the explosion occurred immediately after the fireman went to light the oil burner. We must bear in mind that the lighting of an oil burner in the fire box of a boiler i§ not supposed to 'cause a disastrous explosion or conflagration if the person lighting the burner is competent and careful. If the attorney for the defendant in this case had been taken by surprise, or deprived of an opportunity to rebut the evidence of negligence or incompetence on the part of Leroy Brooker, we would render a judgment of nonsuit, so that the plaintiff might renew the suit, and in the new petition allege negligence or incompetence on the part of the fireman. But it does not appear — and' is not contended —that the defendant might have rebutted the evidence of negligence or incompetence on the part of the fireman if the defendant had been given more time to-procure such evidence. No such request was made when the judge overruled the defendant’s objection to the plaintiff’s testimony, nor has any .such request been made since. The defendant was as well informed before as after the experts» testified, of the facts which indicated the cause of the explosion and fire.
 

 Capt. Johansen testified as a witness for the defendant after the three expert, witnesses for the plaintiff had given their opinion that the explosion was caused by negligence on the part of the fireman; but Capt. Johansen did not say that the explosion might have occurred without negligence ,on the part of the fireman. In fact Capt. Johansen did not offer any suggestion, beyond what might be inferred from his original report, as to what caused the explosion. He was asked by the attorney for the defendant whether the fire was due to lack of skill-on his part,.
 
 *957
 
 as a competent and licensed master, and he answered: “No, sir, absolutely not.” He was asked then by the same attorney if he knew, of his own knowledge, in what part of the ship the fire started; and he replied that it started in the boiler. Asked how he knew that, .he said that it was because the explosion occurred so soon after the fireman went down into the boiler room to light the fire, and because the fire spread so fast. The fireman was never seen nor heard of after the explosion. No one else was in the boiler room or engine room, or near the'boilers, when Leroy Brooker undertook to light the fire. No other officer except the master — and no member of the ship’s crew — was 'Called as a witness in the case. Nobody saw what caused the accident; for poor Brook-er, who was the only one present, went down with the ship.
 

 Our conclusion is that the loss of the value of the ship must be borne by the charterer. The value was far below the amount claimed by the plaintiff. The ship was comparatively small, being only 212 feet long and having a gross tonnage of only 847 tons. She was built in 1881 and was therefore fifty-five years old at the time when she was chartered. In fact, she was so decrepit that she was not insurable, nor eligible for classification, and was deemed by some of the expert witnesses to be almost unseaworthy —ready to be scrapped — and hence worth only $3,000 to $5,000. At the time when she was chartered to the Weinberger Banana Company, the Poydras Fruit Company was offering the ship for sale for $10,000, and had given an option on her at that price, and on very easy terms. The fact that the ship was chartered for three months at $1,500 per month is not a criterion for estimating her value, because the charterer was then very much in need of a ship, equipped as she was, for carrying bananas, and there was no other ship available. As far as the evidence goes, it is not likely that the Gaston would have been in demand at all at the end of the. three months for which she was chartered. We have concluded that a fair average of the various estimates given by the witnesses, of the value of the ship at the time when she was chartered, is $7,500.
 

 The judgment appealed from is set aside, and it is- now ordered, adjudged and decreed that the plaintiff, Poydras Fruit Company, Inc., shall recover of and from the defendant Weinberger Banana Company, Inc., $7,500, with interest thereon at 5 per cent, per annum from judicial demand, November 17, 1936, and the costs of this suit.